Louis ETOCH and Charles E. Halbert, Jr. *v.* L.T. SIMES II,
Circuit Judge

99-467                                                    10 S.W.3d 866

Supreme Court of Arkansas
Opinion delivered February 24, 2000
[Petition for rehearing denied March 30, 2000.]

*Appellants*, pro se.

*Mark Pryor*, Att'y Gen., by: *James E. Gowen, Jr.*, Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. Randy Green was charged on April 25, 1997, with the offenses of capital murder, aggravated robbery, and theft of property. In February 1998, he hired attorneys Louis Etoch and Charles E. Halbert, Jr., to defend him. Two other co-defendants, Damon Evans and Randy Green's cousin, Jason Green, were also charged with the same crimes by separate informations. All three co-defendants were scheduled to be tried separately. Damon Evans pled guilty to first-degree murder and was sentenced to forty years imprisonment before the other co-defendants were tried.

Raymond Abramson and Chris Morledge represented Jason Green during his trial, which began on September 14, 1998. On September 17, 1998, while still representing Randy Green, Mr. Etoch appeared at Jason Green's trial in Monroe County Circuit Court. In the trial judge's chambers, the Prosecuting Attorney, Fletcher Long, Jr., asked that Mr. Etoch be shown as attorney of record for Jason Green. Mr. Etoch responded by stating that he already represented co-defendant Randy Green, but that he had come to assist Mr. Abramson at the Jason Green trial because Mr. Morledge had to leave for a seminar in Seattle, Washington.[1] Mr. Etoch then stated: "I don't want to be shown as an attorney of record and have to do an appeal. I don't want to be shown as an

---

[1] The record does not indicate that Mr. Morledge withdrew from the case.

attorney of record so that it would conflict Randy Green, but I think the law requires two attorneys in a death penalty case." Mr. Long continued to insist that if Mr. Etoch was going to argue jury instructions on behalf of Jason Green and assist Mr. Abramson, he should be shown as an attorney of record. The following colloquy between the trial judge and Mr. Etoch then took place:

> THE COURT: Well, let's just get this straight. We don't have to go through all of that. An objection was made. When this trial began Mr. Abramson advised the court that Mr. Morledge was going to help him and assist him with this case as co-counsel and he was expecting Mr. Halbert or Mr. Etoch. He made that statement but the point is that you can't have your cake and eat it, too. If you want to be on the record representing him you can, but we are not going to be in and out. Otherwise, we have got a problem with the order of the proceedings, you know, who goes first and who goes next. Who is objecting and when someone is not. I am not going to do that. If you want to come in you can come in. If you want to be out you are out. Tell me what your preference is now and it is not going to be in the middle, either you are in or you are out.

> MR. ETOCH: I have agreed to represent Randy Green and the Court knows that and the case has been severed. I do not see a conflict. I have talked with Randy about this and Randy does not see a conflict. As long as there is no conflict. I do not want to enter this case as ...

> THE COURT: I am not going to make a legal opinion for you as to whether or not there is any conflict. That is a decision for you all. I don't represent these people. I am the Judge. I have got to look out for this defendant's rights and the State's rights. The State has made an objection. I take it as an objection. Either you are in or out. It is your option.

> MR. ETOCH: May I confer with Mr. Abramson outside for a moment?

> THE COURT: Yes

> *(Whereupon after Mr. Etoch and Mr. Abramson absented themselves, they returned to chambers and the following was had.)*

> MR. ETOCH: Your Honor, after conferring with Mr. Abramson I am prepared to enter my appearance in this case and would like to do so as co-counsel in this trial.

Thus, Mr. Etoch became the attorney for co-defendants Randy Green and Jason Green, who had been charged with the same crimes, albeit by separate informations. Jason Green's trial ended in a mistrial on September 18, 1998.

Meanwhile, Randy Green's trial was docketed for the week of October 5, 1998. On September 28, 1998, Randy Green, through his attorney, Mr. Etoch, filed a motion for continuance. In the motion, Mr. Etoch argued that he needed more time to prepare for examination of witnesses. He specifically mentioned his need to effectively cross-examine and impeach witnesses who testified at the Jason Green trial regarding "false statements" that they had made. He further alleged that a copy of the testimony from the Jason Green trial would not be available by October 5, 1998. Furthermore, Mr. Etoch alleged in the motion that he had several scheduling conflicts for the week of October 5, 1998. Finally, Mr. Etoch argued that Randy Green would be unduly prejudiced if he was tried so close in time to the Jason Green trial, allegedly because "the atmosphere and/or belief in Monroe County is that Randy Green is guilty." These arguments were controverted by the State, and the trial court ultimately denied Mr. Green's motion for continuance.

Randy Green's trial was scheduled to start on October 6, 1998, with the jury being ordered to convene at 1:30 p.m., so as to allow time that morning for the trial court to consider various motions filed by the parties. During this pretrial hearing, Mr. Etoch and Mr. Halbert renewed their motion for continuance on behalf of Mr. Green, and the trial court once again denied the motion. The pretrial proceedings on October 6, 1998, were not concluded until late that evening, whereupon the trial court released the jury with instructions to reconvene on October 7, 1998, at 9:00 a.m.

The next morning, just before Randy Green's trial was about to begin, Mr. Etoch and Mr. Halbert advised the trial court that they were moving to withdraw as counsel for Mr. Green. According to Mr. Halbert, they were required to withdraw under Rule 1.7 of the Model Rules of Professional Conduct due to a conflict of interest that had arisen since Mr. Etoch entered his appearance in the Jason Green case. The trial court asked Mr. Halbert when the conflict arose, to which he responded:

> Your Honor, as I understand, the possibility of the conflict would arise occurred yesterday. I briefed the subject with the Court —

you know, we knew it was possible that a conflict may arise but we thought that possibility was minimal when we entered his appearance. Yesterday, I asked for some guidance from the Court and it appears that that conflict has actually reared his head [sic] at this time. And it appears obvious to us late yesterday and through research last night.

The trial court then asked: "[w]hat is the conflict?" Mr. Halbert responded:

Your Honor, because of my client's right to attorney — to privilege between he and his attorney, I am reluctant to state what actually the conflict is. But, I'm sure the Court can see the potential conflicts with the possibility that Jason Green may be needing to be called as a witness at this time because his former testimony will not be admitted and various other things, Judge.... And of course, Judge, if he was called as a witness, we would be required to impeach him regardless of who called him so that possibility is there... it has not occurred yet but it is reasonably likely to occur at this time where earlier we thought the risk that it would occur is minimal. Now, it appears that the risk is no longer minimal but is very substantial.

The trial court then asked: "[n]ow are you telling me that you now are of the opinion that the former testimony is not admissible?" Mr. Halbert responded:

I believe that was — based on the Court's ruling yesterday I believe that to be the case. Even if the former testimony is admissible and comes in on its own as an exception to the hearsay rule Jason may now have to be called regardless. But there is no doubt that we believe that it should be admissible in the trial.

After hearing further argument on the issue, the trial court gave Mr. Etoch and Mr. Halbert an opportunity to talk with Randy Green to determine if he was willing to consent to their representation of him, despite their representation of Jason Green. Mr. Halbert spoke with Randy Green and then reported to the court that Mr. Green was not prepared to consent. The trial court granted the motion to withdraw and also granted a continuance. The trial court further stated that "I feel as if the defendant's attorneys are manipulating the judicial system....," and ordered Mr. Halbert and Mr. Etoch to reimburse Monroe County $1,770 for compensation paid to jurors who appeared for jury duty on October 6 and 7, 1998.

The trial court also imposed a fine of $230.00. Mr. Etoch and Mr. Halbert now appeal the imposition of the fine and the jury costs.

For their first point on appeal, the appellants argue that the trial court erred in imposing sanctions on them when he granted their motion to withdraw as counsel for Randy Green. Where fines are imposed, as here, and the punishment cannot be avoided by an affirmative act, the case is one of criminal contempt. *Etoch v. State*, 332 Ark. 83, 964 S.W.2d 798 (1998). The standard of review in a case of criminal contempt requires this court to view the record in the light most favorable to the trial judge's decision and to sustain that decision if it is supported by substantial evidence and reasonable inferences. *Id.* We have consistently held that an act is contemptuous if it interferes with the order of the court's business or proceedings, or reflects upon the court's integrity. *Id.*; *Hodges v. Gray*, 321 Ark. 7, 901 S.W.2d 1 (1995); *Carle v. Burnett*, 311 Ark. 477, 845 S.W.2d 11 (1993).

The appellants argue that there is no basis for the trial court's criminal contempt order because they were professionally obligated to make the motion to withdraw under Rule 1.7 of the Model Rules of Professional Conduct. It is clear from the record, however, that the trial court was not offended by the mere fact that the appellants moved to withdraw as counsel for Randy Green. Rather, the trial court indicated that it was vexed by the inexpedient timing of the motion; that is, by the fact that the motion was not made until after the jury had been convened to try the case:

> Now, I'm going to require the defendant's lawyers to take care of the expenses of this trial. We've had a jury that's been here for two days sitting here in preparation for a trial. This could have been avoided if the defendant's lawyers were not attempting to manipulate the system. It should have been anticipated.... The Court tried to do what was fair and right. And the lawyers persisted that they wanted to — Mr. Etoch should be in that case and the court let him into that case. As a result of that, now we're here today, the jury has been here two days.

With regard to the timeliness of the appellants' motion to withdraw, the trial court asked Mr. Halbert when the conflict of interest first arose. He admitted that the appellants knew at the time Mr. Etoch entered his appearance in Jason Green's case on September 17, 1998, that a conflict of interest might arise due to their representation of both co-defendants. At that time, however, they

thought the possibility of a conflict of interest was minimal. Mr. Halbert contended that it was not until October 6, 1998, when the trial court purportedly ruled that Jason Green's former testimony would not be admissible in Randy Green's trial, that the possibility of a conflict of interest was "no longer minimal but very substantial."[2] According to Mr. Halbert, Jason Green might be called as a witness in the Randy Green trial. In that event, there would be a potential conflict of interest because Jason Green would be subject to cross-examination and impeachment by his own attorneys, the appellants.

The simultaneous representation of parties whose interests in litigation may conflict, such as co-defendants, is governed by Rule 1.7(b) of the Model Rules of Professional Conduct:

> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>
> (1) the lawyer reasonably believes the representation will not be adversely affected; and
>
> (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

With regard to the representation of multiple defendants in a criminal case, the commentary to Rule 1.7 specifically warns that the potential for a conflict of interest is "so grave that a lawyer should decline to represent more than one co-defendant." In *Chambers v. State*, 264 Ark. 279, 579 S.W.2d 79 (1978), we quoted a similar caveat from the ABA Standards Relating to the Defense Function, 3.5(b) (1971):

> Except for preliminary matters such as initial hearings or applications for bail, a lawyer or lawyers who are associated in practice should not undertake to defend more than one defendant in the same criminal case if the duty to one of the defendants may conflict with the duty to another. The potential for conflict of interest in representing multiple defendants is so grave that ordina-

---

[2] The record in this appeal does not include the transcript of the pretrial hearing on October 6, 1998, or the trial court's ruling on the admissibility of Jason Green's former testimony.

rily a lawyer should decline to act for more than one of several co-defendants except in unusual situations when, after careful investigation, it is clear that no conflict is likely to develop and when the several defendants give an informed consent to such multiple representation.[3]

As early as February 23, 1998, the appellants contended in a pleading that the custodial statements given by the co-defendants and Lucinda Evans were "inconsistent with each other in material parts" and that the defenses were "likely to become antagonistic." This contention is in fact supported by the custodial statements given by all three co-defendants and Lucinda Evans. Each co-defendant related a substantially different version of the events which ultimately culminated in the death of Glen Dover.

During the early morning hours of April 5, 1997, Randy Green, Jason Green, and Damon Evans were drinking beer with the victim, Glen Dover, in a motel room when an argument erupted. According to Randy Green's custodial statement, he left the motel room with Damon's sister, Lucinda Evans, to wait inside his truck while Damon and Jason beat the victim and then dragged him outside and put him in the back of his own truck. Randy also stated that Damon left the motel driving the victim's truck, and Randy, Jason, and Lucinda followed in Randy's truck. At one point, Damon stopped, and Randy drove past him and stopped. A few minutes later, Damon took the lead again, and Randy followed

---

[3] A more recent version of the standard is stated in the ABA Standards for Criminal Justice Prosecution Function and Defense Function, Third Edition, 4-3.5(c) (1993):

> (c) Except for preliminary matters such as initial hearings or applications for bail, a lawyer or lawyers who are associated in practice should not undertake to defend more than one defendant in the same criminal case if the duty to one of the defendants may conflict with the duty to another. The potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to act for more than one of several co-defendants except in unusual situations when, after careful investigation, it is clear either that no conflict is likely to develop at trial, sentencing, or at any other time in the proceeding or that common representation will be advantageous to each of the co-defendants represented and, in either case, that:

> (i) the several defendants give an informed consent to such multiple representation; and

> (ii) the consent of the defendants is made a matter of judicial record. In determining the presence of consent by the defendants, the trial judge should make appropriate inquiries respecting actual or potential conflicts of interest of counsel and whether the defendants fully comprehend the difficulties that defense counsel sometimes encounters in defending multiple clients.

Damon to Walnut Lake Bridge, where Damon parked the victim's truck, got into Randy's truck, and they went back to Brinkley.

In contrast, Jason Green said in his custodial statement that it was Damon and Randy who inflicted the beating at the motel and that Randy helped place the victim in the back of his own truck. Jason also stated that Randy rode in the victim's truck with Damon, while he and Lucinda followed in Randy's truck. At some point, they stopped on the side of the road and put the victim, who was "bleeding pretty bad," in the front of the truck. After they arrived at the Walnut Lake bridge, Randy got in his own truck with Jason and Lucinda, while Damon drove the victim's truck down a bank and jumped out before it hit some trees. The foursome then returned to Brinkley in Randy's truck. According to Jason, Damon gave him $200 of the $800 that was taken from the victim.

Damon's statement also implicated Randy Green in the beating and the placement of the victim in the back of his own truck. Damon admitted in his statement that he took the victim's wallet and gave the money to Randy. Damon also stated that Randy helped put the victim in the front of the truck after Damon stopped alongside the road and cut Mr. Dover's throat with a straight razor. Damon confirmed that he put the victim's truck in drive and let it roll down a hill, before he got into Randy's truck with the others and returned to Brinkley.

Finally, Lucinda Evans said in her custodial statement that all three men beat the victim and put him into the back of his truck. She also said that they stopped alongside the road and put the victim into the front of his truck. According to Lucinda, it was Randy and Damon who ran the truck into the water while she and Jason sat in Randy's truck.

As the appellants concluded at the outset of the case in February, 1998, it was clear from the materially inconsistent statements given by the co-defendants that their defenses were likely to be antagonistic. Likewise, when Mr. Etoch entered his appearance as co-counsel on September 17, 1998, and certainly no later than September 18, 1998, when Jason Green's trial ended in a mistrial, it was clear that a conflict of interest was likely to develop as a result of the appellants representing both co-defendants. In other words, their representation of Randy Green would be materially limited by their responsibilities to Jason Green. Nevertheless, the appellants did

not move to withdraw from Randy Green's case until October 7, 1998; that is, after the jury had already been convened to try Mr. Green's case. The trial court found this delay to be a manipulation of the judicial system and an interference with the court's business and, thus, contemptuous.

▪ The appellants contend that their motion to withdraw was timely because the conflict did not arise until the trial court ruled on October 6, 1998, that Jason Green's former testimony would not be admissible at Randy Green's trial. This argument is without merit. It was apparent to the appellants even before Mr. Etoch undertook the representation of Jason Green that the defenses of the co-defendants were likely to be antagonistic. Moreover, as previously stated, the likelihood of a conflict arose at the time Mr. Etoch entered his appearance in Jason Green's case on September 17, 1998, but certainly no later than September 18, 1998, when Jason Green's case ended in a mistrial. Furthermore, Mr. Halbert's argument in support of the motion to withdraw included the following assertion: "Even if the former testimony is admissible and comes in on its own as an exception to the hearsay rule Jason may now have to be called regardless." Thus, even if Jason Green's former testimony was admissible, the appellants conceded that either party might still call Jason as a witness at Randy Green's trial and he would be subject to cross-examination and impeachment by his own attorneys, the appellants. Consequently, the likelihood of a conflict of interest did not arise in this case as a result of an evidentiary ruling by the trial court. Rather, such a likelihood first arose when Mr. Etoch entered his appearance in Jason Green's case on September 17, 1998.

▪ The trial court further found that the appellants were manipulating the system because their motion to withdraw was made shortly after the trial court denied two separate motions for continuance. Specifically, the trial court stated:

> There was a motion for continuance [made on September 28, 1998]. That motion for continuance was denied. That motion was made again yesterday. That motion was again denied. This jury sat here from 1:30 yesterday to late yesterday evening. I released them with instructions to come back and we would start promptly on this case at 9 o'clock today. Everyone was here promptly. Counsel was here — all counsel was here, defendant was here. The jury was here. The Court was here. And then Mr. Halbert comes in chambers and says that he's got a motion to make. The motion that was

with instructions to come back and we would start promptly on this case at 9 o'clock today. Everyone was here promptly. Counsel was here — all counsel was here, defendant was here. The jury was here. The Court was here. And then Mr. Halbert comes in chambers and says that he's got a motion to make. The motion that was required, the court granted a continuance in this case. It seems clear to me that's what the defense attorney wanted. It also appears clear to me that they would do whatever necessary to get it if it means manipulating the rules and manipulating the court or whatever. My problem with it is it appears Mr. Etoch is not going to stop until I make him stop. It's going to keep going on and on and on when Mr. Etoch wants to disrespect the Court, the whole system, and do what he wants to do it [*sic*] when he wants to do it and how he wants to do it, regardless of the consequences and the other parties involved.

Indeed, the appellants assert that they should have been allowed to withdraw from the Randy Green case and, if Jason Green were found not guilty and double jeopardy attached, then Jason Green and Randy Green could conceivably consent to their joint. representation, and the appellants would be able to resume their representation of Randy Green. Under this scenario, nothing would have been achieved other than a postponement of Randy Green's trial so that it would not occur until after Jason Green's second trial setting. Clearly, the act of using a motion to withdraw for the sole purpose of securing a previously denied continuance would interfere with the order of the court's business or proceedings. Viewing the record in the light most favorable to the trial judge's decision, we conclude that there was substantial evidence to support the trial court's finding of criminal contempt.

■ For their second point on appeal, the appellants argue that the trial court erred by permanently disqualifying them from representing Randy Green in the capital murder case pending against him in Monroe County. Appellants contend that their disqualification in this case should not be permanent because circumstances might change in the future. We decline to address this argument because it is purely speculative and premature. *Watson v. City of Fayetteville*, 322 Ark. 324, 909 S.W.2d 637 (1995). *See also, Milholland v. State*, 319 Ark. 604, 893 S.W.2d 327 (1995).

Affirmed.