Elbert HOLDER *v.* STATE of Arkansas

CR 03-3 124 S.W.3d 439

Supreme Court of Arkansas
Opinion delivered October 9, 2003

[Petition for rehearing denied November 20, 2003.]

*Louis A. Etoch*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Clayton K. Hodges*, Ass't Att'y Gen., for appellee.

JIM HANNAH, Justice. Elbert Holder appeals his conviction on capital murder and his sentence of life without parole. Holder argues that the trial court erred in 1) refusing to recuse; 2) refusing to order the appearance of subpoenaed witnesses at the recusal hearing; 3) denying his motion for a directed verdict; 4) finding a *Batson* violation in *voir dire;* 5) putting persons on the jury who should have been excused; 6) refusing to allow him to exercise all his peremptory challenges; and 7) allowing a juror to remain on the case where the juror was a first cousin of a witness and failed to reveal the relationship in *voir dire.*

We hold that the trial court did not err in denying the directed-verdict motion, and that the trial court did not abuse its discretion in refusing to recuse. However, we also hold that the trial court erred in finding a *Batson* violation by Holder, and further erred in denying Holder his right to use his peremptory challenges that the trial court then kept a juror on the panel who should have been excused for cause, and that therefore, the case must be reversed and remanded for a new trial.

*Facts*

Late in the evening of June 23, 2001, police arrived at the scene of a shooting on Highway 85, south of Oneida, in Phillips County. When police arrived, they found Carla Knowlton Smith dead in the front seat of her Ford Expedition that had been driven to the scene by Elbert Holder. Carla had been shot. Shotgun casings were found on the ground. Holder told police that two black men in a Cadillac accosted and robbed him when Holder and Carla pulled over to the side of the road because of an argument about his driving. Holder's arm was wounded, and he had small holes in the bill of his cap. Police believed they found a number of inconsistencies in Holder's story and began an investigation.

Holder was later charged with capital murder. It was alleged that Holder, along with Brenda Dixon and Greg Jenkins, entered into a plan to kill Carla and carried out that plan on June 23, 2001. Holder's trial commenced May 20, 2002. The jury returned a guilty verdict, and Holder was sentenced to life without parole.

## Sufficiency of the Evidence

■ Holder raises the issue of sufficiency of the evidence for his first point on appeal. With regard to our analysis of claims of insufficient evidence, this court recently stated:

> This court has repeatedly held that in reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Id.; Wilson v. State*, 332 Ark. 7, 962 S.W.2d 805 (1998). We affirm a conviction if substantial evidence exists to support it. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000). Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id*. Circumstantial evidence may provide the basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Fairchild v. State*, 349 Ark. 147, 76 S.W.3d 884; *Bangs v. State*, 338 Ark. 515, 998 S.W.2d 738 (1999). In other words, if you have two equally reasonable conclusions as to what occurred, this merely gives rise to a suspicion of guilt which is not enough to support a conviction. *Howard v. State*, 348 Ark. 471, 79 S.W.3d 273; *cert. denied*, 123 S.Ct. 606 (2002); *Gregory v. State*, 341 Ark. 243, 15 S.W.3d 690 (2000).

*Edmond v. State*, 351 Ark. 495, 501-02, 95 S.W.3d 789 (2003).

With this standard in mind, we conclude that there was substantial evidence to support the jury's verdict, although other trial errors require reversal. David Henson testified that Holder approached him and asked Henson if he would kill Carla. Brenda Dixon, Holder's long time girlfriend and mother of Holder's fifteen-year-old son, testified that Holder decided to kill Carla because Carla was going to provide evidence against Holder in an insurance fraud matter in Louisiana. Dixon testified that Holder discussed killing Carla on at least two occasions before finalizing those plans on Friday, June 22, 2001. On that Friday before the murder, Holder met with Dixon and instructed her to drive Greg Jenkins to where Carla was to be killed. Jenkins was to shoot Carla. Then according to Dixon, on Saturday, Holder met Dixon and Jenkins at the Pine Apartments where Holder instructed Dixon to pick up Jenkins between 4:30 p.m. and 5:30 p.m. Holder told Dixon and Jenkins that he would pick up Carla, and take her to an abandoned house near Oneida, where Dixon would deliver Jen-

kins who would then shoot Carla. Holder also explained that he would tell police he and Carla were robbed and Carla was shot by two black men who left in a black Cadillac.

Dixon then testified that when she picked up Jenkins, Jenkins had a shotgun which he put in the back seat of the car. Dixon then drove Jenkins to Helena Crossing where they met Holder. There they determined that they needed shotgun shells and Holder returned to town to acquire them. Upon Holder's return, they all drove out of town and pulled over where Holder shot a hole or holes in his cap using a pistol he had on his person. At this point, again according to Dixon, Holder drove on to pick up Carla, and Dixon drove Jenkins to the abandoned house and let him out. Jenkins hid in some weeds, and Dixon drove the car down the road and parked where she could still see the abandoned house. Victoria Chairse, who lives in the area, testified that on the night of the murder, she saw a car parked where Dixon testified she had parked the car. Dixon also testified that she saw Holder drive up and pull to the side of the road near the abandoned house, get out, and open the hood. Then she heard three shots she believed came from a shotgun. Dixon testified further, that she heard a fourth shot, although it was not as loud as the first three, and then Jenkins came running down the road to her car. Jenkins put the shotgun in the back seat. Dixon then took Jenkins to get a beer, and they put the shotgun in the trunk before returning to town.

According to the testimony of Brenda Taylor, she had loaned her car to Dixon that Saturday morning on June 23, and Dixon did not return to her home until early Sunday morning. Taylor testified further that Dixon was driving her own car when she returned, and they had to drive to where Taylor's car was parked behind a rest area. There, Taylor found her car dirty with grass on it. They took the car home, and that evening, Taylor discovered clothing in the back seat. She also found a flashlight and shotgun shells wrapped in a white napkin inside the car. She opened the trunk and found a shotgun. Taylor called police who took the shotgun and shells.

Taylor testified that the next morning, Dixon appeared at her home wanting the keys to the car. Shortly after Dixon's arrival, Taylor saw Holder and another man in the yard. After Dixon got the keys, she went outside where she and Holder opened the trunk. Taylor testified that from what she could see Dixon and Holder were discussing

something, but she could not hear their conversation. According to Taylor, the police soon arrived and arrested Dixon and Holder.

Expert firearms/tool marks examiner Gary Lawrence testified that the shotgun seized from Taylor was the shotgun used to fire the casings found at the scene of the murder. Trace evidence expert Jeffrey Taylor testified that the damage to the clothing Carla was wearing was consistent with a shotgun blast from about ten feet, and that the holes in the cap showed copper residue consistent with jacketed ammunition rather than shotgun pellets and appeared to be near-contact shots. This would be consistent with Dixon's report that Holder shot his cap with a pistol.

Sharenzia Smith, Carla's daughter, testified that Holder showed up at her home about 5:00 a.m. Sunday morning. Sharenzia asked Holder where her mother was, and at first he said he did not know. When Sharenzia pressed Holder, he told her that there had been a robbery and her mother "did not look too good." According to Sharenzia, Holder then asked if she wished to go to the hospital, but when she said "yes," Holder went to Carla's room and began to remove things from Carla's dresser, including clothing that Holder and Carla had purchased for their honeymoon in the Bahamas.

■ Much of the testimony against Holder was provided by Dixon, who helped Holder plan and carry out the murder. The testimony of an accomplice must be corroborated before a defendant may be convicted of a felony. *Barnett v. State*, 346 Ark. 11, 53 S.W.3d 527 (2001). Arkansas Code Annotated section 16-89-111(e)(1)(A-B) (Supp. 2003) provides that a conviction cannot be had in any case of a felony upon the testimony of an accomplice unless it is corroborated by other evidence tending to connect the defendant with the commission of the offense and, further, the corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof.

■ The evidence in this case constitutes substantial evidence in support of the jury verdict. Further, although Dixon was a key witness, her testimony was corroborated by other evidence connecting Holder with the murder. There is no merit to Holder's claim that the trial court denied his directed-verdict motion in error.

## Recusal

Holder argues that the trial judge was required to recuse because he showed "bias or prejudice" in the proceedings of this case. According to Holder, Judge Simes was biased because:

> the victim's sister was an employee of the Judge's former law firm, the Judge's former law firm represented the victim, a witness placed Judge Simes's brother Alvin at the victim's mother's home the day after her death, appellant's counsel's known intention to run against Judge Simes in the next election, and that appellant's counsel's law partner in fact ran against Judge Simes in the last election.

Holder presented the following evidence at the recusal hearing. Through the testimony of Lorri Knowlton, Carla's sister, Holder showed that Lorri worked for a summer for Alvin Simes at the Simes law firm in the summer of 1987 or 1988, while Judge L.T. Simes was a member of the firm. Lorri also thought that the Simes firm did represent Carla at some point, but Lorri did not know the purpose of the representation. Carla's mother Willie Knowlton testified that Lorri worked for the Simes firm for a short time, but she could not recall when. Willie also testified that she received no condolences from the trial judge upon her daughter's murder. Willie further testified that she had not talked to the trial judge about her daughter's death, that the trial judge had never been in her home, and that she did not recall seeing the trial judge at Carla's funeral. Holder's sister Nancy Heard testified that she saw Alvin Simes in Willie Knowlton's yard the day after Carla was killed. This comprises the testimony that was offered on the issue of bias, based on an alleged relationship with the family.

Holder subpoenaed two additional witnesses, Judge Simes's brother, Alvin, and Judge Simes's wife, Edelma, who did not appear pursuant to the subpoenas because a witness fee was not tendered with the subpoenas. When Alvin and Edelma Simes did not appear, Holder moved the trial court to compel their appearance, however, the trial court denied the motion. Holder now argues that he was improperly denied his right to compulsory process under Ark. Code Ann. § 16-43-208 (Repl. 1999). This code section provides that the clerk of the court is to provide subpoenas for a criminal defendant. The right to compulsory process arises under the Sixth Amendment to the United States Constitution and article 2, section 10, of the Arkansas Constitution.

■■ Before a criminal defendant can show that he or she was deprived of the right to compulsory process, he or she must show that the testimony would be both material and favorable to his or her case. *Ray v. State*, 304 Ark. 489, 803 S.W.2d 894 (1991); *see also United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982). Holder argued to the trial court that there were questions he wanted to ask the witnesses, the answers to which he did not know. In response to the State's brief, Holder stated, "Since the witnesses were not required by Judge Simes to abide by the subpoenas and come to court, it is mere speculation on the part of the State concerning what exactly they would have testified to." It is clear that Holder was simply hoping that the subpoenaed witnesses would provide helpful testimony. This falls short of the required showing that the testimony would have been "both material and favorable to his case." Therefore, Holder shows no prejudice from the trial court's decision not to order the witnesses' appearance and testimony and does not prevail on this argument. *See Lewis v. State*, 309 Ark. 392, 831 S.W.2d 145 (1992). Additionally, the testimony that was offered at the hearing does not show bias by the trial judge.

■ Both the Arkansas Constitution, article 7, section 20, and the Arkansas Code of Judicial Conduct, Canon 3C (2003), provide that a judge shall not preside over cases in which a judge might be interested, and a judge must avoid all appearances of bias. *Gates v. State*, 338 Ark. 530, 2 S.W.3d 40 (1999). A trial court enjoys a presumption of impartiality. *Kail v. State*, 341 Ark. 89, 14 S.W.3d 878 (2000).

■■ Further, the question of bias is usually confined to the conscience of the judge. *Sanders v. State*, 352 Ark. 16, 98 S.W.3d 35 (2003). Even where a judge knows someone connected with another criminal case involving the defendant, that mere fact standing alone is not cause for recusal. *Ayers v. State*, 334 Ark. 258, 975 S.W.2d 88 (1998). The decision of whether to recuse is within the trial court's discretion. *Kail, supra.* Abuse of that discretion must be proven by showing bias or prejudice. *Kail, supra.*

■■ To decide whether there has been an abuse of discretion, we review the record to see if prejudice or bias was exhibited. *Irvin v. State*, 345 Ark. 541, 49 S.W.3d 635 (2001). The party seeking recusal must demonstrate bias. *Searcy v. Davenport*,

352 Ark. 307, 100 S.W.3d 711 (2003); *Bradford v. State*, 328 Ark. 701, 947 S.W.2d 1 (1997). Further, unless there is an objective showing of bias, there must be a communication of bias in order to require recusal for implied bias. *Searcy, supra; City of Dover v. City of Russellville*, 346 Ark. 279, 57 S.W.3d 171 (2001). Absent some objective demonstration by the appellant of the trial judge's prejudice, it is the communication of bias by the judge that will cause us to reverse his or her refusal to recuse. *Irvin, supra.*

We note that a judge is not required to recuse because of his or her life experiences. *Reel v. State*, 318 Ark. 565, 886 S.W.2d 615 (1994). This court in *Reel* stated:

> The circumstance of a trial judge's unfortunate encounters with the same crimes charged against the accused is not mentioned in Canon 3, nor have any of our cases confronted the issue. There is, however, authority from other jurisdictions suggesting a judge should not be disqualified because of his or her life experiences. For example, in *State v. Williams, supra*, the defendant in a products liability action involving a defective industrial machine sought to have the judge disqualified because the judge suffered an injury to his hand in a similar industrial accident thirty years before. In finding this argument to be meritless, the Appellate Division reasoned as follows:
>
> > A judge ordinarily is not disqualifiable because of his own life experiences. Obviously a judge is not disqualified from presiding at an automobile accident because he was once himself in an automobile accident. Nor is a judge disqualified from trying a divorce case either because he is himself married or divorced, or from trying a contested adoption case because he has either natural children or adopted children.

*Reel,* 318 Ark. at 569-70.

The court stated, however, that "there may be a specific situation which would render it appropriate for a judge to recuse himself in a particular case." *Id.* In the present case, there is no objective showing of prejudice or communication of bias.

However, Holder argues further that the trial judge also abused his discretion when he refused to recuse based on the existing relationship between his counsel Louis Etoch and the judge. Etoch provided a history of difficulties including three times that Judge Simes held Etoch in contempt. In two of those

instances, Etoch appealed and Judge Simes was affirmed. *See Etoch v. Simes*, 340 Ark. 449, 10 S.W.3d 866 (2000); *Etoch v. State*, 332 Ark. 83, 964 S.W.2d 798 (1998). Additionally, Etoch noted a night he spent in jail at the trial court's order. Holder also notes that Etoch notified Judge Simes that he would run against him at the next election, and that Etoch's partner Charles E. Halbert had run against Judge Simes in the prior election. It is true that a judge should not preside in a trial where counsel is running in an election against the judge, but that is not the case here where a past election and a declaration about running in the future are involved. *See Seeco, Inc. v. Hales*, 334 Ark. 134, 969 S.W.2d 193 (1998).

▆ As already discussed, the decision of whether to recuse is within the trial court's discretion. *Kail, supra*. Further, abuse of that discretion must be proven by showing bias or prejudice. *Kail, supra*. In deciding whether there has been an abuse of discretion, we review the record to see if prejudice or bias was exhibited. *Irvin, supra*. Finally, the party seeking recusal must demonstrate bias. *Searcy, supra*. Our review of the record fails to reveal prejudice or bias in the trial court's handling of this case.

*Batson Violation/Excuse for Cause*

▆ Holder argues that the trial court erred in sustaining the State's *Batson* objection where the State argued that Holder was using his peremptory challenges to strike jurors solely on the basis of race. Under *Batson*, "a prosecutor in a criminal case may not use his peremptory strikes to exclude jurors solely on the basis of race." *Wooten v. State*, 351 Ark. 241, 91 S.W.3d 63 (2002). Similarly, a criminal defendant may not exercise peremptory challenges based on race of the juror or racial stereotypes. *Georgia v. McCollum*, 505 U.S. 42 (1992), *see also Hollowell v. State*, 59 Ark. App. 39, 953 S.W.2d 588 (1997).

At trial the following occurred between prosecutor Long and defense counsel Etoch:

> (*Whereupon the following was had in the absence of the prospective jury panel.*)

> MR. LONG: There have now been seven Caucasians walk into this courtroom. Etoch has exercised peremptory challenges to every one of the seven without fail.

THE COURT: Is there anything else?

MR. LONG: No, sir.

ETOCH: Is Mr. Long seriously contending that I did not have a racially-neutral reason for excluding one or all three of those three jurors?

The parties then began a discussion of race-neutral reasons asserted by Holder. Later in explaining its decision in sustaining the *Batson* objection, the trial court stated:

> THE COURT: Now, I have previously found that there was a pattern, and even though the State has continued to object and to make his record regarding Etoch's exercising his perempts against white individuals or Caucasian individuals, Etoch had continued. I mean, that's just the truth. The State has raised this objection throughout this process and then the truth is, at this point, every white person — Caucasian person — that's been in the panel, Etoch struck... I just can't get past the pattern. I mean, it's there. It's in the record. It's just in the record.

The United States Supreme Court in *Batson v. Kentucky*, 476 U.S. 79 (1986), adopted a three-part test to determine whether a peremptory strike violates the Equal Protection Clause. In *MacKintrush v. State*, 334 Ark. 390, 978 S.W.2d 293 (1998), this court discussed *Purkett v. Elem*, 514 U.S. 765 (1995), the United States Supreme Court case which outlined three steps for a trial court to follow when a *Batson* challenge is made:

> (1) the opponent of a peremptory challenge must make a *prima facie* case of racial discrimination; (2) the proponent of the strike must come forward with a race-neutral explanation; and (3) the trial court must decide whether the opponent has proven purposeful racial discrimination. *Purkett*, 514 U.S. at 767.

*MacKintrush*, 334 Ark. at 397. In *Hinkston v. State*, 340 Ark. 530, 10 S.W.3d 906 (2000), this court stated of *Batson* challenges:

> We have delineated a three-step process to be used in the case of Batson challenges. *MacKintrush v. State*, 334 Ark. 390, 978 S.W.2d 293 (1998). First, the strike's opponent must present facts to raise an

inference of purposeful discrimination; that is, the opponent must present a *prima facie* case of racial discrimination. *Id.* Second, once the strike's opponent has made a *prima facie* case, the burden shifts to the proponent of the strike to present a race-neutral explanation for the strike. *Id.* If a race-neutral explanation is given, the inquiry proceeds to the third step, wherein the trial court must decide whether the strike's opponent has proven purposeful discrimination. *Id.* Here, the strike's opponent must persuade the trial court that the expressed motive of the striking party is not genuine but, rather, is the product of discriminatory intent. *Id.*

*Hinkston*, 340 Ark. at 538-39.

As discussed above, there are three steps to proving a *Batson* violation. The first step of making a *prima facie* case of purposeful discriminatory intent in the use of peremptory strikes is accomplished by showing: (1) that the strike's opponent is a member of an identifiable racial group, (2) that the strike is part of a jury-selection process or pattern designed to discriminate, and (3) that the strike was used to exclude jurors because of their race. *Cox v. State*, 345 Ark. 391, 47 S.W.3d 244 (2001).

However, our analysis in this case will not include the first step because the parties made the issue of the first step moot by skipping it and proceeding directly to step two. The record shows that the *Batson* challenge began by the State objecting to Holder's attempt to use his peremptory challenges to strike all Caucasian jurors from the *venire* panel. The State's objection was simply noting to the trial court that Holder had used peremptory challenges on all the Caucasians. The trial court then offered the State an opportunity to elaborate on the objection and explain it further, but the State declined to do so. Etoch then offered race-neutral explanations for his attempt to excuse the jurors. The State then argued that the reasons offered were pretextual, including the assertion that, "if it were up to Mr. Etoch, there would be no Caucasians on this jury." Next, the trial court considered whether the State had proven purposeful discriminatory intent, and concluded it had based upon Holder striking every Caucasian juror. The trial court noted, "I just can't get by the pattern."

Once the party striking jurors offers a race-neutral explanation, and the trial court rules on the ultimate issue of intentional discrimination, the preliminary issue of whether a *prima facie* case was shown becomes moot. *Wooten v. State*, 325 Ark. 510,

931 S.W.2d 408 (1996); *Hernandez v. New York,* 500 U.S. 352 (1991). That is precisely what the parties did in this case.

Because the issue of step one is moot, we are left to determine whether the trial court erred when it proceeded to step three and found Holder acted out of a purposely discriminatory intent in exercising his peremptory challenges. The States objection was based solely upon Holder attempting to strike all Caucasian jurors, and the trial court decided the issue on that basis, stating, "I just can't get by the pattern." Thus, the question before this court concerns step three and presents the issue of whether the trial court erred in the third-step analysis under *Batson* by basing a finding of fact of purposeful discriminatory intent solely on Holder's attempt to excuse all Caucasian persons on the *venire* panel.

■ We review the trial court's findings of discriminatory intent by determining whether the trial court's decision was clearly against the preponderance of the evidence. In *Williams v. State,* 338 Ark. 97, 991 S.W.2d 565 (1999), we stated:

> We will reverse a trial court's ruling on a *Batson* challenge only when its findings are clearly against the preponderance of the evidence. *Green v. State,* 330 Ark. 458, 956 S.W.2d 849 (1997). In making *Batson* rulings, this court accords some measure of deference to the trial court in that it is in a superior position to make these determinations because it has the opportunity to observe the parties and determine their credibility. *Sanford v. State,* 331 Ark. 334, 962 S.W.2d 335 (1998); *Roseby v. State,* 329 Ark. 554, 953 S.W.2d 32 (1997). Moreover, unless discriminatory intent appears in the prosecution's explanation, the reason given will be considered raceneutral. *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Consistent with our holdings, the record reflects the court struggled over this issue, weighing and assessing the facts and arguments presented, to decide whether the State's explanation was merely pretextual. *MacKintrush, Id.*

*Williams,* 338 Ark. at 111-12.

■ In step three under *Batson,* the trial court must make a finding of fact whether purposeful discrimination has been shown. *Batson, supra.* This requires the trial court to determine whether the party opposing the strikes has carried the burden of proving purposeful discrimination. *Hernandez,* 500 U.S. at 359. Proof of racially discriminatory intent or purpose is required to

show a violation of the Equal Protection Clause. *Id.* The ultimate burden of persuasion that there is purposeful discriminatory intent rests with and never shifts from the party opposing the strikes. *Purkett v. Elem.*, 514 U.S. 765, 768 (1995). Further, the United States Supreme Court has stated:

> Discriminatory purpose ... implies more than intent as volition or intent as awareness of the consequences. It implies that the decision maker ... selected ... a particular course of action at least in part 'because of' not merely 'in spite of' its adverse effects upon an identifiable group.

*Hernandez*, 500 U.S. at 360. Intent to discriminate based on race must be shown. Thus, disparate impact alone is not enough to prove purposeful discriminatory intent under step three of the *Batson* analysis. *See State v. McCrary*, 963 S.W.2d 674 (Mo. Ct. App. 1998). Striking even one juror for racial reasons violates the Equal Protection Clause. *United States v. Matha*, 915 F.2d 1220 (8th Cir. 1990). However, purposeful discriminatory intent must be proven. *Batson, supra.* The trial judge relied on a "pattern" in finding an intent to discriminate. In *Batson*, the United States Supreme Court discussed a pattern in stating, "[f]or example, a pattern of strikes against black jurors included in the particular *venire* panel might give rise to an inference of discrimination." *Batson*, 476 U.S. at 97. Thus, under step one, a pattern of strikes may provide sufficient proof to state the *prima facie* case; however, even under step one, a party "who requests a *prima facie* finding of purposeful discrimination is obligated to develop a record beyond numbers . . . ." *United States v. Wolk*, 337 F.3d 997, 1007 (8th Cir. 2002).

In the present case, three jurors were at issue when the objection was made. The trial court discussed the three white jurors, Gibson Turley, Wayne Stevens, and Nicholas Jacks. With respect to Turley, Holder offered that counsel knew Turley personally, that through *voir dire* it appeared Turley had decided that Holder was involved in the death, and that Turley knew an attorney who had represented Carla. Then, with respect to Stevens, Holder offered that Stevens's father-in-law was a prominent law enforcement officer in Phillips County, that Stevens knew Greg Jenkin's mother, that he knew a lot of the witnesses, that Stevens knew the prosecuting attorney's father and visited regularly with him. Finally, with respect to Jacks, Holder offered

that his counsel Etoch had sold a house to Jacks, that Jacks was often behind on his house payments and required Etoch to send dun letters, threaten eviction, and demand money from Jacks. Further, Jacks had retained Etoch and received a recovery on a legal action, and Jacks had expressed to some that Etoch had charged too much.

 Because the trial court proceeded to step three under *Batson,* it is apparent that the trial court accepted the reasons offered by Holder as race-neutral. It is only once the trial court determines that the reasons given are race-neutral that the trial court proceeds to determine whether the State proved purposeful discriminatory intent in the exercise of peremptory challenges. Where the only evidence offered to prove purposeful discriminatory intent in step three is evidence that the party striking jurors struck all the members of a particular race included in the *venire* panel, there is a lack of proof of intent to purposefully discriminate, and the proof fails. The trial findings are clearly against the preponderance of the evidence. *Williams, supra.* A *Batson* error is not subject to harmless-error analysis. *Ford v. Norris,* 67 F.3d 162 (8th Cir. 1995). Therefore, this case must be reversed; however, the case must also be reversed because the trial court erroneously refused to allow Holder to exercise his peremptory challenges, thereby effectively exhausting Holder's peremptory challenges and forcing him to accept a juror that should have been excused for cause.

> The law is well settled that to challenge a juror's presence on appeal, an appellant must demonstrate two things: (1) that he exhausted his peremptory challenges, and (2) that he was forced to accept a juror who should have been excused for cause. See *Ferguson v. State,* 343 Ark. 159, 33 S.W.3d 115 (2000); *Bangs v. State,* 338 Ark. 515, 998 S.W.2d 738 (1999); *Willis v. State,* 334 Ark. 412, 977 S.W.2d 890 (1998).

*Carmargo v. State,* 346 Ark. 118, 123, 55 S.W.3d 255 (2001).

 Pursuant to Ark. Code Ann. § 16-33-305 (Repl. 1999), a criminal defendant has twelve peremptory challenges in a capital murder case. The right is statutory. Previously, it was a common-law right. There is no right to peremptory challenges under the federal constitution. *Ford, supra.*

Normally, "[t]o challenge a juror on appeal, appellant must show he exhausted his peremptory challenges and was forced to accept a juror who should have been excused for cause." *Williams v. State*, 347 Ark. 728, 67 S.W.3d 548 (2002); *Branstetter v. State,* 346 Ark. 62, 57 S.W.3d 105 (2001). However, here, Holder tried to exercise the challenges but was precluded from doing so by the trial court. After the trial court sustained the *Batson* objection and seated the three jurors, Holder moved the trial court to use his remaining peremptory challenges to strike those three jurors. When a defendant's peremptory challenges are exhausted, it is error to hold a biased juror competent. *Linell v. State*, 283 Ark. 162, 671 S.W.2d 741 (1984); *Snyder v. State*, 151 Ark. 601, 237 S.W. 87 (1922), *See also*, *Williams, supra*.

"The decision to excuse a juror for cause rests within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Nooner v. State,* 322 Ark. 87, 907 S.W.2d 677 (1995). Persons comprising the venire are presumed to be unbiased and qualified to serve." *Taylor v. State,* 334 Ark. 339, 347, 974 S.W.2d 454 (1998). Here, juror Jacks had been the subject of dun letters and threats of eviction by Etoch. Etoch had demanded that Jacks bring money to his office. It was an abuse of discretion not to excuse Jacks for cause. The case must also be reversed on this basis.

Because we reverse this case on the *Batson* error and consequent error in failing to exclude juror Jacks for cause, we need not reach the remaining issue on juror Hines.

Reversed and remanded.

THORNTON, J., not participating.