Garrick ASHLEY *v.* STATE of Arkansas

CR 03-703                                              191 S.W.3d 520

Supreme Court of Arkansas
Opinion delivered September 16, 2004

*William M. Howard, Jr.*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Valerie L. Kelly*, Ass't Att'y Gen., for appellee.

Jim Hannah, Justice. Garrick Ashley ("Garrick") appeals his conviction for first-degree murder and his sentence of life in prison. Garrick argues that the circuit court erred in denying his motion for a directed verdict, in overruling a *Batson* objection to the State's exercising a peremptory challenge to juror Adanah Washington, and in denying the motion to suppress the in-custody statements. We find no merit in Garrick's assertions of error, and we affirm.

*Facts*

On January 11, 2000, police were called to Lusby's Ambulance Station in Pine Bluff. Upon arrival, police were shown the body of three-year-old Brittany Ashley. Brittany's father Garrick Ashley and Garrick's mother Betty Ashley had brought her body to Lusby's and were present when police arrived. Police saw evidence of abuse on the body and suspected Brittany's death might be a homicide. Garrick became a suspect in Brittany's death when it was learned that the injuries were sustained while she was alone with Garrick, and when Garrick gave an explanation that was not credible.

Garrick was transported to the police station. In the first interview with police, Garrick reported that Brittany suffered her injuries while riding a bike when she fell down a set of steps. However, after a visit to the site after the first interview was completed, Garrick changed his story in the second interview, reporting that Brittany fell in the house and bumped her head on the carpet. Over the course of three in-custody interviews, Garrick admitted to beating Brittany. As the interviews progressed, Garrick admitted to additional mistreatment of Brittany. He ultimately stated that one beating went on for five minutes and that he had just "lost it." He also claimed to have been under the influence of drugs at the time and did not understand that his blows were severe enough to injure her. At trial, Garrick did not deny that he killed Brittany, but rather argued about his culpability.

Dr. Frank Peretti, a State Medical Examiner, testified that Brittany sustained at least one hundred identifiable recent injuries. He further testified that Brittany had multiple scrapes and abrasions to her face, the bridge of her nose, and around the eye. She also had a large bruise on her forehead with an underlying hematoma. Other contusions to her head were noted. Her brain was "very edematous or swollen. . . consistent with blunt force trauma to the head." Dr. Peretti opined that Brittany was struck in the head with an object. In fact, he found evidence of multiple blows to the head. Pattern injuries were found on her chest that were caused by a belt. Other bruises and contusions were pointed out on Brittany's chest. There were multiple internal injuries including hemorrhages in the tissue between her ribs. She had rib fractures. She had internal bleeding, and in the course of the autopsy, a cup and a half of blood was removed from her abdominal cavity. The left lobe of her liver was completely transected and lacerated. Her pancreas was lacerated. Tissue around her kidneys showed contusions. Dr. Peretti

opined that Brittany suffered injuries from kicks or blows. Multiple bruises were found on her back. Abrasions consistent with being beaten with a switch were present as well. Additional contusions from a belt were found on her leg.

Dr. Peretti opined that the injuries were recent and caused her death, and he also stated that she would have died from any one of the several injuries she suffered. He also testified that there was evidence of earlier injuries dating back at least six months.

### Directed Verdict

Garrick moved for a directed verdict at the close of the State's case and at the close of all the evidence. At the close of the State's case, Garrick stated in relevant part:

> Your Honor, I want to make a motion for a directed verdict on the capital murder charge.

At the close of all the evidence, Garrick stated, "I wanted to renew my previous motion. . . ." In his motion for a directed verdict, Garrick argued that the State failed to prove capital murder and asked the court to rule on whether a directed verdict should be granted on the charge of capital murder. Garrick was tried for capital murder; however, he was convicted of first-degree murder. The circuit court was never asked to determine whether a motion for a directed verdict should be granted on first-degree murder. To appeal the denial of a motion for directed verdict, the motion for a directed verdict must challenge the crime for which the defendant was convicted. There is no ruling for this court to review. It is the appellant's obligation to obtain a ruling to preserve an issue for appeal. *Huddleston v. State*, 347 Ark. 226, 61 S.W.3d 163 (2001). This court has specifically considered the issue of a directed verdict motion on capital murder where the defendant is convicted of first-degree murder and held that the denial of a directed verdict motion based on a failure to prove capital murder will not provide a basis on which to appeal where the criminal defendant was convicted of first-degree murder. *Haynes v. State*, 346 Ark. 388, 58 S.W.3d 336 (2001); *Ramaker v. State*, 345 Ark. 225, 46 S.W.3d 519 (2001). Thus, Garrick has no directed verdict motion to appeal.

### Batson

Garrick argues that the circuit court erred in overruling his *Batson* objection to the State's peremptory challenge of

potential juror Adanah Washington. Under *Batson v. Kentucky*, 476 U.S. 79 (1986), a criminal prosecutor may not use a peremptory challenge to exclude a juror solely on the basis of race. At trial, Garrick objected to the State's use of a peremptory challenge to excuse Washington. The State responded by offering as a race-neutral explanation that during *voir dire*, Washington exclaimed, "Amen Sister," when another potential juror stated reluctance at imposing the death penalty. Because the death penalty was sought against Garrick, the State argued Washington could have even been excused for cause. Garrick countered this explanation by arguing that Washington's position on the death penalty could not be considered by the circuit court because no question on the subject was asked of her on the record. Thus, Garrick argued, the court had to seat Washington because the only information on Washington's opposition to imposition of the death penalty came from a representation by the State.

█ This court recently discussed a *Batson* challenge in *Holder v. State*, 354 Ark. 364, 124 S.W.3d 439 (2003):

> We have delineated a three-step process to be used in the case of *Batson* challenges. *MacKintrush v. State*, 334 Ark. 390, 978 S.W.2d 293 (1998). First, the strike's opponent must present facts to raise an inference of purposeful discrimination; that is, the opponent must present a prima facie case of racial discrimination. *Id.* Second, once the strike's opponent has made a prima facie case, the burden shifts to the proponent of the strike to present a race-neutral explanation for the strike. *Id.* If a race-neutral explanation is given, the inquiry proceeds to the third step, wherein the trial court must decide whether the strike's opponent has proven purposeful discrimination. *Id.* Here, the strike's opponent must persuade the trial court that the expressed motive of the striking party is not genuine but, rather, is the product of discriminatory intent. *Id.*
>
> *Hinkston*, 340 Ark. at 538-39.

*Holder*, 354 Ark. at 378-79.

Upon Garrick's *Batson* objection, the State immediately offered a race-neutral explanation. The circuit court then found the reason offered by the State to be racially neutral and that the explanation was not pretextual. As we have previously stated, where the parties make the first step in the analysis moot by

skipping it and proceeding directly to step two, our analysis begins at step two. *Holder, supra.* The circuit court concluded that the reason given by the State for excusing Washington was reasonable, or in other words, that it was not pretextual.

We review the circuit court's findings on discriminatory intent by determining whether the circuit court's decision was clearly against the preponderance of the evidence. *Holder, supra.* This court accords "some measure of deference" to the circuit court in that the circuit court is in a superior position to observe the parties and determine credibility. *Williams v. State,* 338 Ark. 97, 112, 991 S.W.2d 565 (1999). Unless discriminatory intent appears in the State's explanation, "the reason given will be considered race neutral." *Williams,* 338 Ark. at 112. The circuit court should consider the objection and weigh and assess the facts and arguments presented. *Williams, supra.* The circuit court did so in this case, and the decision is not clearly against the preponderance of the evidence.

### Motion to Suppress In-Custody Statements

Garrick asserts that he was questioned before being read his rights in violation of *Miranda,* that police made false promises of leniency to induce his confession, and that he was intoxicated at the time of questioning and could not have knowingly and intelligently waived his rights. We find no merit in any of these assertions.

### a. *Miranda*

According to Garrick's testimony at the suppression hearing, he was never read his rights prior to questioning. Garrick was interviewed twice on January 11, 2000, and once on January 12, 2000. Garrick made incriminating statements in all three interviews, and the transcripts from all three interviews include affirmations by Garrick that he was read his rights and understood them. Sergeant Terry Hopson was the lead detective on the investigation into Brittany's death and was the first detective to make contact with Garrick. According to Hopson's testimony at the suppression hearing, once he examined Brittany's body at the paramedic station, determined from that examination that there was apparent abuse, found that Garrick was the caregiver at the time of the injuries, and found that Garrick's explanation of how the injuries were suffered was not credible, he ceased contact with

Garrick until Garrick was transported to the police station and his rights were read to him. According to Hopson's further testimony, while Garrick was at the police station, he was read his rights, initialed his responses, and signed a rights form before questioning began. Again according to Hopson, in the second interview on January 11, 2000, a new rights form was not used and read because it had only been about an hour and a half since the first interview had been completed and because Garrick had been in Hopson's presence and custody the entire time since the first interview was terminated. Between the first and second interviews, Hopson and Garrick went to the home where Brittany was injured to examine the scene. However, the transcript of the second interview shows that at the beginning of the second interview, Hopson confirmed with Garrick that he had been read his rights in the prior interview, that he understood them, and that he had initialed and signed the form in the first interview.

Officer Danny Belvedresi was present at the second interview and testified at the suppression hearing that Hopson asked Garrick in the second interview if he understood his rights and had previously signed and initialed the form, and that Garrick stated "Yes." Belvedresi testified further that he was present at the third interview and that Garrick was read the rights form and that he signed it. Detective Mack Cook testified at the suppression hearing that he was present at the third interview, but that he could not recall being present when the rights form was read to Garrick prior to commencing the third interview. However, Cook did recall Garrick affirming that the form was read to him and that he understood his rights. Garrick admits that he affirmed in the interviews that he had been read his rights, but that his affirmation was not true. He contends that he only stated the rights were read because he believed he was following Hopson's lead as part of an agreement to get leniency if he cooperated.

██ ██ Hopson's testimony shows that once Garrick was taken into custody and transported to the police station, he was not questioned until his rights were read to him. Garrick contradicts this and asserts that he was not read his rights prior to the interviews even though the signed rights forms are in the record and he affirmed in the interviews, that he had been read his rights and understood them. The issue becomes one of credibility. The circuit judge was not required to accept Garrick's version of events. Rather, evaluation of the credibility of witnesses at a suppression hearing lies within the circuit judge's sound discre-

tion. *Cook v. State*, 345 Ark. 264, 45 S.W.3d 820 (2001). Any conflict in the testimony of the different witnesses at a suppression hearing is for the circuit court to decide. *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003). The circuit judge in this case determined that Garrick's rights were read to him, and we find no abuse of discretion in the circuit judge's determination.

### b. *Promise of leniency*

In his brief, Garrick argued:

> The officer even admitted that he somewhat promised the Defendant that he would try to help him, which in itself was misleading and in the defense's opinion he made a promise that induced the Defendant to give evidence against himself, whether it was reliable or not.

This is the sum total provided this court on the issue of an alleged promise of leniency by police. We only have Garrick's assertion of something an officer "somewhat promised" without any reference to the abstract. Utterly no authority is cited, and we are asked to rely on the "defense's opinion" in lieu of argument. Garrick fails to develop the argument which precludes us from considering the issue. *Scott v. State*, 355 Ark. 485, 139 S.W.3d 511 (2003). Further, a failure to cite authority is also reason to affirm. *Robinson v. State*, 348 Ark. 280, 72 S.W.3d 827 (2002).

### c. *Intoxication*

Garrick testified at the suppression hearing that at the time of the interviews, he was "high off drugs." Garrick further testified that he had smoked marijuana that had been dipped in embalming fluid and did not understand what was going on in the interviews. Hopson testified that Garrick appeared to be in a clear state of mind and did not seem to be under the influence of any intoxicants. Belvedresi testified that Garrick did not appear to be under the influence of any intoxicants at either the second or the third interview. Cook also testified that Garrick had been in custody for a day by the third interview and that he did not appear to be under the influence of intoxicants. The circuit court concluded that Garrick was cognizant of what was going on in the interviews, and that he was not inebriated. Again we defer to the circuit court and find no abuse of discretion in the circuit court's factual findings. *Grillot, supra.*

*Rule 4-3(h) Review*

Garrick was sentenced to life imprisonment. Therefore, the record has been reviewed for error on adverse rulings as required by Supreme Court Rule 4-3(h) (2004). No such error has been found.

Affirmed.