2012 Ark. App. 363

**Kendell Clifton NICKELSON,
Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 11–1079.**

Court of Appeals of Arkansas.

May 23, 2012.

Janice W. Vaughn, Little Rock, for Appellant.

Dustin McDaniel, Atty. Gen., Ashley Argo Priest, Asst. Atty. Gen., Little Rock, for Appellee.

CLIFF HOOFMAN, Judge.

After a jury trial, appellant, Kendell Clifton Nickelson, was convicted of aggravated robbery and theft of property, for which he was sentenced to a total of ninety years' imprisonment. On appeal, Nickelson argues that the trial court erred by (1) denying his motions for directed verdict on all charges; (2) failing to instruct the jury on robbery, a lesser-included offense of aggravated robbery; and (3) failing to grant a mistrial when the prosecutor made

improper remarks during closing argument. We affirm.

At trial, Crossett Sheriff David Johnson testified that shortly after 9 a.m. on July 1, 2010, his office received a 911 call reporting shots fired in the Crossett area. Minutes later, there was a second 911 call reporting an armed robbery at the First National Bank of Crossett (FNBC). The report about shots being fired turned out to be a murder, and the victim, Donna Woodberry, had been shot in the head. It was later discovered that Woodberry's vehicle had been used in the robbery and that it had been left running at a church parking lot near FNBC.

Three suspects were identified after an investigation, and arrest warrants were issued for the suspects, including Nickelson. Approximately two weeks after the robbery, Nickelson turned himself in to the Fort Bend County, Texas Sheriff's Department. On his way back to Arkansas, Nickelson was interviewed by Arkansas State Police Special Agents Scott Russell and Scott Woodard, as well as FBI Detective Chad Coulter. A recording of this interview was admitted into evidence and played for the jury, wherein Nickelson admitted participating in the aggravated robbery.

Nickelson explained in his statement that he had driven to Crossett from Shreveport, Louisiana, a couple of days prior to the robbery with Peter Harvey, an acquaintance who had offered him employment in his adult-entertainment-related businesses. Nickelson stated that they were allegedly going to pick up women in Crossett and bring them back to Shreveport to work in Harvey's strip club. When they arrived in Crossett, Nickelson stated that they went to the home of Adrianna Green, who was a friend of Harvey. The next day, the three of them drove around town in Nickelson's Cadillac Escalade, and

Nickelson indicated that Harvey and Green were scouting out different banks that would be easiest to rob, as well as getaway routes. According to Nickelson, he did not take them seriously at that time. They also went to Wal–Mart to buy groceries and to a sporting-goods store to purchase dark, long-sleeved shirts that were later used in the robbery. Nickelson spent the night at a motel that evening and drove back to Green's house early the next morning. While Nickelson and Harvey waited outside in Nickelson's vehicle, Green went inside Wal–Mart, where she purchased a list of items, including paintball masks, a gas can, zipties, and a stopwatch. According to Nickelson, the gas can was going to be used to set an explosion as a diversion while they robbed the bank, although they did not end up using it.

After purchasing the items, Nickelson stated that they dropped Green off at her home, then drove down the street to a nearby house, where Harvey instructed him to let him out and that he would meet him at his motel room. Nickelson said that it was his understanding that this was where the woman who they were going to bring back to Shreveport lived. Approximately twenty minutes later, Nickelson stated that Harvey met him at the motel driving a gold sedan and told him to follow him. Nickelson followed him to a church parking lot, where Harvey informed him that they were going to commit the robbery at that time and gave him a mask, a shirt, and gloves to wear. According to Nickelson, Harvey showed him his gun and told him that he was either going to do it or he would make him do it. Nickelson stated that he had been aware that Harvey carried a gun ever since they left Shreveport, because he had seen it tucked into Harvey's pants whenever he got out of the car. The two men then drove to FNBC in

the gold sedan and went inside the bank. Nickelson walked in first and went straight to a teller who was handling stacks of money. He stated that the teller was fighting him as he tried to get the money and that he hit her a couple of times in the face with his fist. Harvey was holding a gun to the head of another person in the bank while Nickelson collected the money, and they then left the bank and drove back to the nearby parking lot where Nickelson had left his Escalade running.

As Nickelson and Harvey drove out of town in the Escalade, leaving the gold sedan behind, Nickelson stated that Harvey kept his gun in his lap as a threat. When they had to stop at a convenience store for directions, Nickelson claimed that Harvey used a ziptie to bind his hands to the steering wheel so that he could not escape. They drove back to Louisiana, where Nickelson dropped Harvey off at his house. He stated that Harvey gave him $3000 and that he then went to visit his girlfriend and some family members. According to Nickelson, he did not find out about Woodberry's murder until his family called him and told him that he was wanted for capital murder. Nickelson fled to Texas, where he eventually turned himself in. In his interview, he admitted that he had been part of the plan to rob the bank but claimed that he "punked out at the last minute" and that Harvey had forced him to do it.

Winnie Sue Smith, the FNBC bank manager, testified that on the morning of July 1, 2010, two masked men entered the bank and proceeded to rob it. Smith stated that the first male, who was noticeably smaller than the second male, went immediately to the teller area, where $20,000 in cash was sitting out until it could be placed in the ATM machine. The second male, who came in directly behind the other male and was armed with a gun, ran to her and the bank customer with whom she had been talking, Mike Carter, ordering them at gunpoint to lie face-down on the floor. Smith stated that the men stole $19,520 from the bank.

Mike Carter testified that, before he lay down on the floor, he witnessed the smaller man, Nickelson, run over to the teller area and start beating Kim Edwards, an FNBC bank teller. The larger man, Harvey, then put the gun to Carter's head and yelled at him to get all the way down. After several minutes, Harvey yelled to Nickelson, "Let's go, let's go, let's go," and both men ran out the front door and drove off in a gold car. Carter stated that he was able to get the license number of the car before it drove away.

Edwards testified that she was preparing to stock the ATM machine that morning when she saw out the window two individuals wearing masks that were running toward the front door of the bank. She attempted to move the money out of sight underneath the counter but Nickelson then came around the corner and hit her in the face with his fist, knocking her into her workspace. Edwards tried to push him away but Nickelson continued to hit her in the face. When she finally pushed him away and saw him picking up the money from the floor, he said, "Where is the rest of the money, bitch? Bitch, where is the rest of the money?" She stated that the men left after Harvey yelled at Nickelson, "Come on, let's go, let's go" and that she immediately called 911. Edwards testified that she had to have two surgeries to repair her broken nose.

Brandon Bryant, the loss-prevention manager of the Crossett Wal–Mart, testified that he was able to identify through their computer system the receipts from purchases of Nickelson, Harvey, and

Green. A receipt from July 1, 2010, at around 7:30 a.m., showed purchases of two paintball masks, a gas can, cable ties, and a stopwatch that then led investigators to a particular segment of the security film where they were able to identify Green as the person who had purchased the items. The video also showed Nickelson's Cadillac Escalade in the parking lot at the same time that Green was in the store.

Shelby Hughes, a criminal investigator with the Crossett Police Department, testified that he interviewed Green and obtained information through which Harvey and Nickelson became suspects in the bank robbery. He also obtained a second video from Wal–Mart from June 30, 2010, which showed all three suspects at the checkout line with groceries. After Green's home was searched, a Wal–Mart bag was found containing the packaging of the paintball masks and the stopwatch, along with the receipt for all of the items purchased the morning of July 1.

Based on this information, an arrest warrant was issued for Nickelson on July 9, 2010, and he was initially charged with capital murder, kidnapping, aggravated robbery, and theft of property. The criminal information was later amended prior to trial to reduce the charges to first-degree murder, aggravated robbery, and theft of property. At the conclusion of the State's case, Nickelson made motions for directed verdict on the first-degree murder and aggravated-robbery charges, which were denied by the trial court. These motions were renewed on the same bases at the conclusion of all of the evidence and were again denied by the trial court. Subsequent to deliberations, the jury deadlocked on the first-degree murder charge and a mistrial was declared on that count, which was later nol-prossed by the State. The jury found Nickelson guilty of aggravated robbery, for which he was sentenced to sixty years' imprisonment, and theft of property, for which he received a thirty-year sentence. The jury recommended that the sentences run consecutively, for a total of ninety years' imprisonment, and the trial court accepted that recommendation. A judgment and commitment order was entered on August 5, 2011, and Nickelson timely appealed from this order.

On appeal, Nickelson first argues that the trial court erred in denying his motions for directed verdict on all of the charges. A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Williams v. State*, 2010 Ark. App. 759, 2010 WL 4523758. On appeal from a denial of a motion for directed verdict, the sufficiency of the evidence is tested to determine whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* In determining whether there is substantial evidence to support the verdict, this court reviews the evidence in the light most favorable to the State and considers only that evidence which supports the verdict. *Id.* Substantial evidence is that evidence which is of sufficient force and character to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.* The jury is free to believe all or part of a witness's testimony, and this court does not weigh the credibility of witnesses on appeal, as that is a job for the fact-finder. *Young v. State*, 371 Ark. 393, 266 S.W.3d 744 (2007).

As charged by the State in this case, a person commits the offense of aggravated robbery if he commits robbery and is armed with a deadly weapon or represents by word or conduct that he is armed with a deadly weapon. Ark.Code Ann. § 5–12–103(a)(1)–(2) (Repl.2006). A person commits a robbery if, with the purpose of committing a theft or resisting apprehension immediately thereafter, he employs physical force upon another person. Ark.

Code Ann. § 5–12–102 (Repl.2006). "Theft of property" occurs when a person knowingly takes or exercises unauthorized control over the property of another person with the purpose of depriving the owner of the property and is a Class B felony when the value of the property is $2500 or more. Ark.Code Ann. § 5–36–106(a)(1), (b)(1)(A) (Repl.2006).[1]

Pointing to his statement to police that he was coerced into committing the robbery of FNBC by Harvey's threats, Nickelson contends that the evidence was insufficient to support his convictions for aggravated robbery and theft of property because he did not willingly or purposefully participate in the bank robbery and because the State failed to prove that he acted as an accomplice of Harvey. As the State asserts, Nickelson's challenge to the sufficiency of the evidence supporting his theft-of-property conviction is not preserved for appellate review, as he failed to make a directed-verdict motion regarding this particular charge. See Ark. R.Crim. P. 33.1(c) (2011) (stating that the failure to make a specific and timely motion for directed verdict or dismissal constitutes a waiver of any challenge to the sufficiency of the evidence regarding that offense on appeal); Young, supra. He did, however, address the aggravated-robbery charge in his directed-verdict motions, and thus, his argument relating to this conviction is preserved for our review.

The jury was instructed on accomplice liability in accordance with AMI Crim.2d 401 as follows:

> An accomplice is one who directly participates in the commission of an offense, or with the purpose of promoting or facilitating the commission of the offense: Solicits, advises, encourages or coerces the other person to commit the offense; or Aids, agrees to aid, or attempts to aid the other person in planning or committing the offense.

Because Nickelson claimed that he did not willingly participate in the commission of the robbery, the jury was also instructed on the affirmative defense of duress, which stated that "he engaged in the conduct charged because he reasonably believed he was compelled to do so by the threat or use of unlawful force against his person that an individual of ordinary firmness in [Nickelson's] situation would not have resisted." AMI Crim.2d 606.

Due to his claim that he was under duress by Harvey, Nickelson argues that the jury was left to speculation and conjecture in determining his guilt on the aggravated-robbery charge. We disagree and find substantial evidence existed to support the jury's decision to convict Nickelson of this offense. According to Nickelson's own statement to police, he participated in the planning of the aggravated robbery by driving Green and Harvey around town on the day prior to the robbery in order to case possible bank targets, scout out the best routes out of town, and buy clothing intended to be worn during the robbery. The morning of the robbery, Nickelson stated that he drove back to Green's house and took them to Wal–Mart, where Green purchased the paintball masks, zipties, gas can, and a stopwatch. Further, after dropping Green off at her house, Nickelson agreed to meet Harvey at the motel, then followed him to the church parking lot, where they got into the victim's car that was used in the robbery. Nickelson also indicated that he was aware that Harvey carried a gun in

---

1. The 2011 amendment rewrote much of this statute; however, the theft offense in this case occurred prior to the amendment and is subject to the version of the statute in effect at that time.

his pants prior to the robbery. Therefore, by his own admission, there was sufficient evidence to find that Nickelson acted as an accomplice by participating in the planning of the bank robbery.

While Nickelson claims that he thought the prior planning for the robbery was simply idle talk by Harvey and Green, that he "punked out" when Harvey told him that they were actually about to commit the crime, and that he only followed through with it because Harvey threatened him with the gun, the jury chose not to believe this testimony, which it was entitled to do as the fact-finder, and we do not reverse on matters of credibility. *Young, supra.* Further, Nickelson admitted that Harvey did not actually point the gun at him but merely showed it to him, and the testimony of the eyewitnesses to the crime established that Nickelson immediately started beating the bank teller in the face when he entered FNBC and that he yelled, "Where is the money, bitch," before stealing almost $20,000. While it is undisputed that Nickelson himself was not armed during the bank robbery, there was substantial evidence that he directly participated in and was an accomplice to the crime, and we affirm his convictions for both aggravated robbery and theft of property.

Nickelson also contends that the trial court erred when it denied his motion for a directed verdict on the first-degree murder charge, thereby allowing the prosecution to overcharge, and the jury to over-sentence, him. He argues that, because he was over-charged by the prosecutor, the jury was prejudiced and reached its verdict out of anger or compromise. We are unable to address this argument, however, because in order to appeal the denial of a directed-verdict motion, the motion must challenge the crime for which the defendant was actually convicted. *Ashley v.*

*State,* 358 Ark. 414, 191 S.W.3d 520 (2004). Here, the jury could not reach a unanimous verdict on the first-degree murder charge, and a mistrial was declared as to this offense; thus, even if this court were to determine that the trial court erred in denying the directed-verdict motion on this charge, Nickelson cannot demonstrate prejudice, as any possible error would be rendered harmless by the jury's verdict. *Jordan v. State,* 323 Ark. 628, 917 S.W.2d 164 (1996); *Hickson v. State,* 312 Ark. 171, 847 S.W.2d 691 (1993). We therefore decline to review Nickelson's challenge to the sufficiency of the evidence supporting the first-degree murder charge.

In his second point on appeal, Nickelson contends that the trial court erred by failing to instruct the jury on simple robbery, which is a lesser-included offense of aggravated robbery. As Nickelson asserts, it is reversible error to refuse to give an instruction on a lesser-included offense when the instruction is supported by even the slightest evidence. *Brown v. State,* 347 Ark. 44, 60 S.W.3d 422 (2001). Thus, we will affirm the trial court's decision to exclude an instruction on a lesser-included offense only if there is no rational basis for giving the instruction. *Id.* Generally, a robbery instruction is required when the defendant is charged with aggravated robbery. *Id.* There is an exception to this rule, however, when the evidence is so conclusive as to show that only aggravated robbery could have taken place. *Id.*

Here, when Nickelson requested that the trial court give his proffered instruction on robbery, the State argued, and the trial court agreed, that there was no basis for giving the lesser-included offense in this case because there was no dispute that Harvey, Nickelson's accomplice, possessed a gun during the bank robbery and that Nickelson was aware of this weapon. Nickelson claims, however,

that there was insufficient proof presented by the State that he was an accomplice of Harvey, as he was under duress and did not willingly act as one. He asserts that the jury could thus have concluded that his actions toward the teller and his acceptance of some of the robbery proceeds could have made him guilty of only simple robbery and theft of property.

■ We disagree with Nickelson's argument on this point. The jury instruction on accomplice liability, as well as the instruction on the affirmative defense of duress, applied to all of the crimes charged. Nickelson's theory of the case was that he was not criminally responsible for the commission of any of these crimes because he was under duress and did not act willingly as Harvey's accomplice. Where the defendant essentially argues that he did not commit any offense at all, there is no rational basis for the giving of lesser-included offenses. *Doby v. State*, 290 Ark. 408, 720 S.W.2d 694 (1986); *Nichols v. State*, 69 Ark.App. 212, 11 S.W.3d 19 (2000). Likewise, where it is indisputable, as it was in the present case, that an armed robbery took place, it is not error for the trial court to refuse to give a lesser-included instruction on robbery. *Young v. State*, 283 Ark. 435, 678 S.W.2d 329 (1984). We therefore affirm on this point.

■ In Nickelson's third and final point on appeal, he argues that the trial court erred by failing to grant a mistrial when the prosecutor made the following allegedly improper remarks during the State's closing argument:

> Some folks do what they want to do, they're just not going to learn. They are going to do what they want to do. It's about me. I need the money to pay these old fines and his back support for these children I dearly love. I need the money. Well, it's not about you. It's

about the rest of us. Anyone else who might have the idea. . . .

Nickelson then objected, arguing that the State was telling the jury to send a message with its verdict and that this was inappropriate. The State responded that general deterrence is an accepted argument, and the trial court overruled the objection, warning the State not to go further than general deterrence. The State continued its argument, requesting that the jury send a message to potential bank robbers by its verdict. Nickelson failed to object further or to ask for an admonition to the jury or a mistrial.

■ Nickelson contends on appeal that the trial court abused its discretion by not granting a mistrial. As the State asserts, however, he cannot now complain about this alleged error when he did not request a mistrial from the trial court. *Rankin v. State*, 329 Ark. 379, 948 S.W.2d 397 (1997); *Floyd v. State*, 278 Ark. 86, 643 S.W.2d 555 (1982). A trial court is generally under no duty to sua sponte declare a mistrial. *Floyd, supra*. Moreover, a mistrial is a drastic remedy to be employed only when an error is so prejudicial that justice cannot be served by continuing the trial and when it cannot be cured by an instruction to the jury. *Lee v. State*, 340 Ark. 504, 11 S.W.3d 553 (2000). A trial court is granted wide discretion in controlling trial counsel during closing arguments, and its ruling on an objection during closing argument, as well as its decision on whether to grant a mistrial, will not be reversed absent an abuse of discretion. *Id.*

■ While Nickelson recognizes his failure to request further relief, he argues that the trial court should have intervened and declared a mistrial on its own motion to correct what he deems was a serious error by allowing the State to make a

"golden rule" argument. Nickelson points to the exceptions to the requirement of a contemporaneous objection at the trial level that are set forth in *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980), one of which requires the trial court to intervene on its own motion to correct a serious error. No such serious error occurred during closing argument in this case, however. Nickelson is correct that "golden rule" arguments, which suggest to jurors that they place themselves in the position of a party or victim, have been held to be impermissible. *See, e.g., King v. State*, 317 Ark. 293, 877 S.W.2d 583 (1994). However, the statement made by the State here in its closing argument was not in fact a "golden rule" argument. Instead, as the trial court recognized, it was one of general deterrence, which is typically allowed, as the primary purpose of our sentencing statutes is to deter criminal conduct and foster respect for the law. *See, e.g., Lee v. State, supra; Love v. State*, 324 Ark. 526, 922 S.W.2d 701 (1996). Contrary to Nickelson's assertion, these "send a message" arguments have not been found to improperly appeal to jurors' passions and are not reversible error. *Lee, supra; Muldrew v. State*, 331 Ark. 519, 963 S.W.2d 580 (1998). Therefore, the trial court did not abuse its discretion in overruling Nickelson's objection during closing argument, and there was no serious error that required the trial court to intervene sua sponte and declare a mistrial.

Affirmed.

GLOVER and ABRAMSON, JJ., agree.