SLIP OPINION     Cite as 2015 Ark. App. 643

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CR–15–85

| | |
|---|---|
| TYLER JORDAN MEANS<br>APPELLANT | **Opinion Delivered** November 12, 2015 |
| V. | APPEAL FROM THE GARLAND<br>COUNTY CIRCUIT COURT<br>[NO. 26CR-13-404] |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE MARCIA R.<br>HEARNSBERGER, JUDGE |
| | AFFIRMED |

## BART F. VIRDEN, Judge

A Garland County jury convicted appellant Tyler Jordan Means of aggravated robbery, first-degree battery, and theft of property valued under $1,000. He was sentenced to serve an aggregate term of twenty years' imprisonment. Means raises two points on appeal: (1) the evidence was insufficient to support his convictions, and (2) the trial court erred in denying his motion for mistrial. We affirm.

### I.  *Summary of Trial Testimony*

The evidence established that around 10:30 p.m. on December 13, 2012, Robert and Dorothy Gossage were at home, along with their grandson, Robert Allen Howard, who was visiting. Mr. Gossage had gone to bed, and Mrs. Gossage and Howard were talking when they heard a loud knock on the door. Mrs. Gossage heard someone say, "Grandmother, Grandmother, let us in!" As Mrs. Gossage was turning the doorknob, two men rushed in. The victims testified that both men were dressed in black and wore hoods; that they had

their faces concealed—one with a white bandana; and that they were armed—one with a gun, identified as a Ruger 9-mm handgun, and the other with a baseball bat. The assailant with the gun went to the bedroom where Mr. Gossage was sleeping and tried to remove a large television from the wall. Mr. Gossage awoke and struggled with the robber, who shot him in the leg and head. The men stole a small television from the kitchen, took liquor and wine, and got $200 cash from Mrs. Gossage's purse.

## II. *Arguments & Discussion*

### A. Sufficiency of the Evidence

Means argues that the trial court erred in denying his directed-verdict motions because there was insufficient evidence to support his convictions for aggravated robbery,[1] first-degree battery,[2] and theft of property valued under $1,000.[3] A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Nickelson v. State*, 2012 Ark. App. 363, 417

---

[1]A person commits aggravated robbery if, with the purpose of committing a felony or misdemeanor theft, the person employs or threatens to immediately employ physical force upon another person while armed with a deadly weapon. *See* Ark. Code Ann. §§ 5-12-103(a)(1), 5-12-102(a) (Repl. 2013).

[2]Arkansas Code Annotated section 5-13-201(a) provides that a person commits battery in the first degree if, acting alone or with one or more other persons, the person commits a felony, and, in the course of and in furtherance of the felony, the person or an accomplice causes serious physical injury to any person under circumstances manifesting extreme indifference to the value of human life. Ark. Code Ann. § 5-13-201(a)(4) (Repl. 2013).

[3]A person commits theft of property if he knowingly takes or exercises unauthorized control over property of another person with the purpose of depriving the owner of the property. Ark. Code Ann. § 5-36-103(a)(1) (Repl. 2013). Theft of property is a Class A misdemeanor if the value of the property is $1,000 or less. Ark. Code Ann. § 5-36-103(b)(4)(A).

S.W.3d 214. The test for such motions is whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Substantial evidence is evidence of sufficient force and character to compel a conclusion one way or the other and pass beyond mere suspicion or conjecture. *Id.* On appeal, we review the evidence in the light most favorable to the appellee and consider only the evidence that supports the verdict. *Id.* The jury is free to believe all or part of a witness's testimony, and this court does not weigh the credibility of witnesses on appeal, as that is the duty of the fact-finder. *Id.*

Howard testified that, within a few minutes of the robbers entering his grandparents' residence, he knew the man with the gun was Allen Land because he recognized his voice. Mr. and Mrs. Gossage knew Land through Howard. Land and Howard met at The Father's House, a drug-rehabilitation program, and became close friends. Land had no family, so Mr. and Mrs. Gossage had welcomed him into their family.

Land and another accomplice testified against Means.[4] Malcom Easley, who had stayed in Means's truck during the robbery, testified that Land and Means had talked about "hitting a lick," or committing a robbery, while at a party at Land's house on December 13, 2012. Land testified that they had made "kind of a combined decision" to rob someone and that he suggested robbing the Gossages. The accomplices' testimony established that Land and Means wore all black; that Land had on a ski mask, while Means had a white bandana covering his face; that Land was armed with a Ruger 9-mm handgun; and that Means had

---

[4]Land pleaded guilty to aggravated robbery and was serving time in the Arkansas Department of Correction, while Malcom Easley was in the Garland County jail facing charges.

a baseball bat. Land testified that he and Means had yelled "Grandma! Grandma!" at the door of the Gossages' residence and forced their way inside. Land was surprised to see his friend Howard there. Land stated that, after he had shot Mr. Gossage in the bedroom, he returned to the kitchen to see Howard and Mrs. Gossage lying face down on the floor with Means guarding them with the baseball bat. Easley testified that, when Land and Means returned to the truck, Land asked him whether he had heard anything and that Means blurted out, "Allen shot somebody!" Land testified that they returned to the party at his house, told a few of their friends that they had just committed a robbery, and began taking group photos. Land posted on social media websites a couple of photos taken on the night of the robbery depicting bottles of Grey Goose vodka and Patron tequila taken from the Gossages' home, as well as the Ruger 9-mm handgun with which Land had shot Mr. Gossage. Other photos were admitted into evidence, taken days earlier, of the three accomplices holding various items, including one photo in which Means is holding a white bandana.

Elizabeth Lawson testified that she was at a party at Land's house in December 2012; that Land, Means, and Easley had left the party for thirty minutes to one hour; that they had acted "really weird" when they returned; that she had heard them talking about having committed a robbery; that she had seen Land with a gun; and that she had observed Land and Means "high-fiving" each other and acting "like they had just won the lottery."

Charles McMillan, who was also at Land's party, testified that, after the party had ended, Means came to his house between 1:00 a.m. and 3:00 a.m. asking to speak with him. McMillan testified that Means said, "Dude, we messed up," and then told him that he had

4

SLIP OPINION

gone into a house and stolen a television and money. The next afternoon, McMillan said that Means came over again and said, "Dude, the police are looking for us, and you have to tell them I was here last night watching movies." McMillan refused.

Aaliyah Taitt, McMillan's girlfriend at the time and Easley's sister, testified that she used McMillan's Facebook account with his permission. Taitt sent a message to Means pretending to be McMillan in an attempt to get information to help clear her brother's name. An exhibit was entered into evidence showing the following Facebook conversation between Taitt and Means:

| | |
|---|---|
| MCMILLAN [TAITT]: | aye I heard dey got allen |
| MEANS: | Yea but all is clear he took it |
| MCMILLAN [TAITT]: | took wat |
| MEANS: | Blame and charges |
| MCMILLAN [TAITT]: | damn how u find out u talk to dat nigga |
| MEANS: | Police told me . . . he got 15 |
| MCMILLAN [TAITT]: | nigga 15 4 wat<br>wtf yall niggas do in dere |
| MEANS: | Robbery breaking and entering and attempted murder |
| MCMILLAN [TAITT]: | attempted murder? |
| MEANS: | He hit that Nigga |
| MCMILLAN [TAITT]: | smh tyler means malcom said nt to go in dere |
| MEANS: | Ikr |
| MCMILLAN [TAITT]: | yall niggas dun fucked up u better stay low |

MEANS:                    I'm leaving Monday

MCMILLAN [TAITT]:    wen yall 2 was in dere u ddnt tlk right
                      so dey dnt recognize ur voice like dey did allen

MEANS:                    Nahh he took all the blame and he didn't snitch

Malachai Fontenot testified that around December 15, 2012, when he visited with Means at another friend's house, they were talking about "something bad that had happened a couple days before." According to Fontenot, Means described how he and Land had committed a robbery, but it "went horribly bad, since someone was accidentally shot by mistake."

Steven Bell and Jessica Golden, friends of Land's who went to his house on December 13, 2012, around 6:30 or 7:00 p.m. to buy marijuana, testified that Land had talked about plans to rob an elderly couple and that he had showed them his gun and ski mask. Bell and Golden did not take Land seriously, though, because he was "messed up on pills."

Easley testified that he had the following conversation with Means on Facebook shortly after the robbery:

EASLEY:    YoOo why the police come to my house lookin for Malcom young smh

MEANS:     They did?

EASLEY:    Yup I was like I don't kno nothing . . . they got Allen . . . they said he wanna talk to them ... shocked the shit outta me

MEANS:     Oh yea they don't they tryna get somebody to snitch

EASLEY:    His mugshot online Alabama . . . I told ya niggas don't do it . . . but the nigga not dead

6

MEANS:        Oh dam aye Yoo we can't msg on fb nomo that's being watched delete the messages

EASLEY:        nigga they not worried about you . . . they wanted Allen . . . ah iight

MEANS:        Trust me they are

In challenging the sufficiency of the evidence supporting his convictions, Means argues on appeal that there were numerous instances of witnesses contradicting each other with regard to his participation in the robbery; that the victims could not positively identify him as one of the robbers; that there was a lack of forensic evidence placing him at the scene; that the police failed to investigate a person who could have been Land's accomplice during the robbery; that Land and Easley likely obtained lesser sentences for telling the police what they wanted to hear; that Land and Easley were permitted to have contact with each other while in jail, which gave them time and opportunity to concoct a scenario that involved him; and that the trial court erred in admitting State's exhibits 28 and 29—the Facebook conversations—because there was no way to lay a proper foundation to establish that he was on the other end of the conversations.

Some of these points were not raised in Means's directed-verdict motions and are thus not preserved for review. *Williamson v. State*, 2009 Ark. 568, at 7, 350 S.W.3d 787, 791 ("An issue raised for the first time on appeal will not be considered because the trial court never had an opportunity to rule on it."). In any event, all of these arguments present questions of fact and involve credibility and the weight of the evidence, which were matters for the jury to determine. *Nickelson*, *supra*. We note that the jury heard all of the evidence, and defense counsel was permitted to cross-examine the witnesses to point out the very weaknesses that

7

Means complains of on appeal. As for the Facebook conversations, to the extent that this argument can be considered one concerning the sufficiency of the evidence—as opposed to evidentiary error—the appellate courts consider evidence both properly and improperly admitted when reviewing a sufficiency-of-the-evidence challenge. *See Bell v. State*, 371 Ark. 375, 266 S.W.3d 696 (2007). We hold that the evidence set forth above was substantial evidence to support Means's convictions and, therefore, affirm.

## B. Motion for Mistrial

Means argues that the trial court erred in denying his motion for mistrial based on the State's failure to disclose a prosecutor's subpoena through discovery. A mistrial is an extreme and drastic remedy that will be resorted to only when there has been an error so prejudicial that justice cannot be served by continuing with the trial or when the fundamental fairness of the trial has been manifestly affected. *Britton v. State*, 2014 Ark. 192, 433 S.W.3d 856. A circuit court has wide discretion in granting or denying a mistrial motion, and, absent an abuse of that discretion, the circuit court's decision will not be disturbed on appeal. *Id.*

Defense witness, Detective Mark Fallis with the Hot Springs Police Department, testified that he wanted to speak with Daylon Regner, who was at Land's party on the night of the crimes, but that Regner's attorney would not permit it. Fallis applied for a prosecutor's subpoena. Although Regner came to the police department, he refused to speak with the prosecutors. Directing his attention to the trial court, defense counsel asserted that the prosecutor's subpoena should have been provided to the defense through discovery. The State responded that there was nothing to provide but that, in any event, it was work

product. Defense counsel moved for a mistrial, and the trial court denied the motion.

A prosecutor is required to disclose all information in its possession that could be exculpatory to the defense. Ark. R. Crim. P. 17.1. When testimony is not disclosed pursuant to pretrial discovery procedures, the burden is on the appellant to establish that the omission was sufficient to undermine confidence in the outcome of the trial. *Rychtarik v. State*, 334 Ark. 492, 976 S.W.2d 374 (1998). The key in determining if a reversible discovery violation exists is whether the appellant was prejudiced by the prosecutor's failure to disclose. *Id.* Absent a showing of prejudice, we will not reverse. *Id.*

The prosecutor's subpoena is not in the record. When evidence is excluded by the circuit court, the party challenging that decision must make a proffer of the excluded evidence at trial so that this court can review the decision, unless the substance of the evidence is apparent from the context. *Brown v. State*, 368 Ark. 344, 246 S.W.3d 414 (2007). Means did not request to see the prosecutor's subpoena after learning at trial that it was not disclosed by the State during discovery, and it is not apparent from the context that the subpoena contained any exculpatory information. Means makes a conclusory statement that the State's failure to disclose the subpoena was prejudicial and warranted a mistrial, but this court cannot determine whether there was in fact prejudice without seeing the prosecutor's subpoena. It was Means's burden to demonstrate prejudice, and he cannot. Therefore, we must affirm on this point.

Affirmed.
KINARD and HOOFMAN, JJ., agree.

*Jouett Law Firm*, by: *Jason Andrew Jouett*, for appellant.
*Leslie Rutledge*, Att'y Gen., by: *Vada Berger*, Ass't Att'y Gen., for appellee.